# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

| | | |
|---|---|---|
| **United States of America,** | ) | |
| | ) | |
|                   **Plaintiff,** | ) | |
| | ) | |
|     **v.** | ) | **Criminal Action Number** |
| | ) | **04-00192-01/02/03-CR-W-DW** |
| **Johnnie Dethrow,** | ) | |
| **Somer C. Newland, and** | ) | |
| **David M. Nanos,** | ) | |
| | ) | |
|                   **Defendants.** | ) | |

## Report and Recommendation

Pending before the Court are the separate motions to suppress filed by Defendant Dethrow , Defendant Newland and Defendant Nanos (Docs. #49, 47, and 51 respectively). On January 19, 2005, the undersigned held an evidentiary hearing on the defendants' motions. Defendant Dethrow was present and was represented by his counsel, Susan Hunt. Defendant Newland was present and was represented by her counsel at the time, Elena Franco. Defendant Nanos was present as well and was represented by his counsel, Assistant Federal Public Defender, Larry Pace. The government was represented by Assistant United States Attorney Catherine Connelly. At the evidentiary hearing, the government called Wal-Mart loss prevention officers Paul Walter and David Akers as well as Detectives Christina Nunez, John Howe and Michael Hosack of the Independence, Missouri Police Department as witnesses. Additionally, the following exhibits were admitted into evidence:

| Number | Description |
| --- | --- |
| Govt. #1. | photograph of interior of vehicle |
| Govt. #2. | photograph of "equate antihistabs" package |
| Govt. #3. | photograph of various items of evidence seized from vehicle |
| Def. #10. | photocopy of Wal-Mart receipt |
| Def. #11. | photocopy of Wal-Mart receipt |

On the basis of all the evidence adduced at the evidentiary hearing, the undersigned submits the following:

## PROPOSED FINDINGS OF FACT

1. Paul Walter ("Walter") and David Akers ("Akers") are employed by Wal-Mart as loss prevention officers. (Tr. 5-6, 81) Christina Nunez ("Det. Nunez") John Howe ("Det. Howe") and Michael Hosack ("Det. Hosack) are employed as detectives for the Independence, Missouri Police Department. (Tr. 110, 170-171, 204)

2. At approximately 4:00 in the afternoon of December 11, 2003, Walter observed a male and female (later identified as defendant Dethrow and defendant Newland respectively) enter the south entrance of the Wal-Mart in Independence, Missouri. (Tr. 10). Walter's attention was drawn to them because they appeared to him to be acting "goofy" by laughing and playing around. (Tr. 10, 26-27) Walter watched as the pair stopped at the battery display which held several types of batteries, some of which looked like lithium batteries. (Tr. 10, 27-28) Walter observed Dethrow and Newland select several packages of blue batteries that resembled Energizer lithium batteries. This observation was significant to Walter, in part, because he knew that lithium batteries are used in the manufacture of methamphetamine. (Tr. 11, 28) Using his cell phone, Walter notified Akers of his suspicion that shoplifters may have entered the store. (Tr. 12, 28, 56, 84, 96-97) Walter based this suspicion on the way the pair was acting and the fact that batteries are one of the most highly shoplifted items in the Wal-Mart. (Tr. 12, 28-30)

3. After placing the batteries in their shopping cart, Dethrow and Newland proceeded to the pharmacy section of the Wal-Mart. (Tr. 12, 31) Walter followed the pair and was joined by Akers near the

2

pharmacy area. (Tr. 12, 56, 66, 85, 101) Walter and Akers watched as Dethrow selected several bottles of hydrogen peroxide from the pharmacy aisle and placed them in the shopping cart. (Tr. 13, 31-32, 85) Dethrow and Newland traveled further down the aisle where Dethrow selected four packages of pseudoephedrine and placed them in the shopping cart as well. (Tr. 12, 31-32, 85) At this point, Akers called Det. Howe on his cell phone and informed him of Dethrow and Newland and their selection of pseudoephedrine, hydrogen peroxide and batteries that looked like lithium batteries. Det. Howe told Akers he was en route to Wal-Mart and directed Akers to inform the off-duty police officer of the activities of Dethrow and Newland and to further direct the off-duty police officer to stop and identify the suspects in the event Det. Howe did not arrive at the store in time to do it himself. Akers then contacted Det. Nunez who was the off-duty police officer working at the Wal-Mart that day and informed her as Det. Howe had instructed. (Tr. 17, 49, 85-86, 88-90, 97-98, 100-101, 106-107, 114-117, 141-142, 175-176, 177-178, 191) Det. Nunez agreed to stop and identify the individuals. (Tr. 88)

4. Dethrow and Newland then left the pharmacy aisle and randomly traveled throughout Wal-Mart through the toy department and the small appliance department. (Tr. 15) In the small appliance department, Dethrow and Newland selected a coffee maker and several packages of coffee filters. (Tr. 16, 42) The actions of Dethrow and Newland were significant to Walter and Akers because they knew lithium batteries, hydrogen peroxide, pseudoephedrine and coffee filters were each components in the manufacture of methamphetamine. (Tr. 11, 14-15, 16)

5. Upon leaving the small appliance department, Dethrow removed two of the packages of pseudoephedrine from the shopping cart and went to a self-checkout aisle, while Newland took the shopping cart and remaining items to a different self-checkout aisle. (Tr. 16-17, 43, 58, 88-89) Walter testified that while he could not actually see Dethrow pay for the pseudoephedrine because the checkout was several check stands away from him, he saw Dethrow leave the store first with a sack containing something. (Tr. 17, 44, 72, 73, 75) However, Walter did observe Newland as she placed the coffee maker on the floor at a self-checkout aisle and did not purchase it. (Tr. 18, 44, 57-58) He further observed as she purchased the two packages of pseudoephedrine, another health and beauty product, and three bottles of hydrogen peroxide. (Tr. 18, 44). Walter testified that

3

while Newland did not place the batteries on the checkout conveyor belt, he thought she had placed the coffee filters on the conveyor belt. (Tr. 18, 44) However, the Wal-Mart receipt retrieved during the subsequent search indicated that only two packages of pseudoephedrine, a toothbrush and three bottles of hydrogen peroxide were purchased. (Def. Ex. #10)

6. Akers observed Newland at the checkout and watched as she exited the Wal-Mart. Akers saw the boxes and pseudoephedrine, peroxide and coffee filters inside her Wal-Mart sack. (Tr. 90, 91, 101, 105) However, he was not close enough to the checkout to observe whether she actually paid for the coffee filters. (Tr. 90-91) Akers testified he did not recall whether Newland used a self-checkout register. (Tr. 104)

7. Two Wal-Mart receipts were retrieved during the subsequent search. (Def. Ex. #10, Def. Ex. #11) Def. Ex. 10 lists two packages of pseudoephedrine, a toothbrush and three bottles of hydrogen peroxide and indicates a checkout time of 16:36:55 but does not bear any indication the check stand was a self-checkout. (Tr. 46-48) Def. Ex. #11 lists two boxes of antihistabs and indicates a checkout time of 16:41:25 at a self-checkout (Tr. 46-48, 73-74) Walter testified that older self-checkout register do not indicate on the receipt that the purchase was made at a self-checkout. He further testified that as the older self-checkout registers are replaced the newer registers are programmed to indicate that the purchase was made at a self-checkout register. (Tr. 65) Walter also testified that he is aware of similar discrepancies on register receipts in other Wal-Mart investigations (Tr. 66, 69, 70-71)

8. As Newland left the Wal-Mart, Det. Nunez followed her out of the store. (Tr. 91) Det. Nunez had observed Dethrow as he was leaving the checkout area and Newland during her checkout process at a different aisle. (Tr. 117, 142) She watched as Dethrow appeared to be talking into a cell phone headset/earpiece and Newland talked on a cell phone throughout the checkout process. (Tr. 117) Det. Nunez watched as Dethrow left the store and paced back and forth outside the exit doors. (Tr. 118, 142) Det. Nunez considered his behavior odd since it was extremely cold outside that day. (Tr. 118, 143) Det. Nunez watched as Newland completed checking out and observed that she was taking an extremely long time and was looking around constantly. (Tr. 119, 143) As Newland left the store, Det. Nunez observed that Dethrow

4

had left the front of the store. (Tr. 119, 143) Det. Nunez followed Newland out of the store and observed a Chevy Beretta waiting in the fire lane to pick up Newland. (Tr. 119, 131, 143-144) Det. Nunez approached the Chevy Beretta and saw Dethrow was driving. She asked Dethrow to turn off the car and give her the keys. (Tr. 120, 132, 145) Det. Nunez testified that she instructed Dethrow to turn off the car and hand over the keys because it was the holiday season and several cars were utilizing the Wal-Mart fire lane as a kind of loading zone and there were many pedestrians in the area as well. She testified that she was concerned about officer and pedestrian safety if Dethrow attempted to drive away through the pedestrians. (Tr. 120, 159) Det. Nunez stopped the vehicle based upon what she had observed and what Akers had told her. (Tr. 121) Through walkie-talkie communications from Akers and Walter, as well as her personal observation of Dethrow and Newland, she knew that they had selected pseudoephedrine, hydrogen peroxide, and coffee filters, and she believed they were obviously attempting to avoid Wal-Mart limits on the purchase of pseudoephedrine by splitting up and going to different registers to purchase two boxes of pseudoephedrine separately. (Tr. 22-125, 127-129)

9. Because it was extremely cold, Det. Nunez told Newland to get into the car and keep her hands up on the front dash. (Tr. 133, 146, 159, 161-162) She told Dethrow to keep his hands on the steering wheel. (Tr. 133) She instructed the suspects in this manner due to concerns for officer safety. (Tr. 133) While Det. Nunez was informing dispatch of the license plate number and requesting an assisting unit, she observed Newland making furtive movements about the vehicle and removing her hands from the dash after having been instructed once before to leave her hands on the dash. (Tr. 133-134, 168-169) Det Nunez directed Newland once again to hold still. Newland continued to move inside the vehicle (Tr. 135) Det. Howe arrived on the scene and Det. Nunez told him of Newland's failure to keep still. Det. Howe observed Newland moving and told her to stay still as well. After Newland failed to do as instructed Det. Howe removed her from the vehicle and Det. Nunez conducted a pat-down and placed her in handcuffs for her safety as well as the officer's safety. (Tr. 135-137, 149, 164, 178) When Det. Howe arrived on the scene he pulled his police car in front of the Chevy Beretta to block it from moving. (Tr. 164, 178)

10. As Det. Nunez was handcuffing Newland, Det. Nunez and Det. Howe noticed a heavy chemical odor about Newland's person and coming from the open door of the vehicle. (Tr. 136, 149, 179) The detectives recognized the smell as consistent with methamphetamine manufacturing. (Tr. 136, 149-150, 179, 182, 196) Det. Howe also observed several Wal-Mart bags containing boxes of pseudoephedrine and peroxide as well as matches which are also used in methamphetamine manufacture. (Tr. 179, 195, Govt. Ex. #1) Because it was so cold outside, Det. Nunez placed Newland in the back seat of the patrol car rather than leave her on the curb. (Tr. 136) During the pat-down Det. Nunez recovered a receipt for syringes as well as two baggies containing white powder and white powder residue. (Tr. 137-138, 165) Det. Nunez notified the other officers on the scene that there may be needles in the vehicle or on the suspects. (Tr. 137) Det. Howe instructed Dethrow and Nanos to exit the vehicle. He could smell the same heavy chemical odor on their person as well. (Tr. 183) Dethrow and Nanos were arrested. (Tr. 184, 201)

11. After Det. Nunez returned to the Chevy Beretta, Walter informed her that Newland was moving about the patrol car. (Tr. 137, 164) Newland's continued movement inside the patrol car suggested to Det. Nunez that Newland could have been attempting to hide a weapon or drugs. (Tr. 137) Det. Nunez removed Newland from the patrol car to search her again and recovered a white bottle shoved into the back seat of the patrol car. Newland said she had removed the bottle from the crotch of her pants. (Tr. 138, 167) The white bottle contained what appeared to Det. Nunez to be a marijuana cigarette. (Tr. 138, 167) Det. Nunez placed Newland under arrest. (Tr. 138, 166)

12. The Chevy Beretta was searched incident to the arrests. (Tr. 184) Various precursor items such as four cases of matches, peroxide, needles, coffee filters, pseudoephedrine were retrieved from the vehicle. (Tr. 184-185, 188, Govt. Ex. #3, )

6

**PROPOSED CONCLUSIONS OF LAW**

In their respective motions to suppress, Dethrow, Nanos and Newland each contend that the initial investigatory stop of the Chevy Beretta by law enforcement outside the Wal-Mart was improper (both initially and in its duration). In the alternative, the defendants argue that even if the investigatory stop was proper, law enforcement officers lacked probable cause to arrest Dethrow, Nanos and Newland. Finally, the defendants assert that any incriminating product of either the improper investigatory stop and/or illegal arrests is "fruit of the poisonous tree" that must be suppressed. As set out herein, the Court concludes that the investigatory stop (both in initiation and duration) was proper, the ensuing arrests were constitutional, and, thus, the Court need not consider arguments related to "fruit of the poisonous tree."

The Fourth Amendment provides that "the right of the people to be secure in their persons, houses,[1] papers, and effects, against unreasonable searches and seizures, shall not be violated. . . ." U.S. CONST. amend. IV. As made clear in the Fourth Amendment, the

---

[1] The stop of an individual in an automobile raises many of the same concerns as a search of an individual's home.

> Automobile travel is a basic, pervasive, and often necessary mode of transportation to and from one's home, workplace, and leisure activities. Many people spend more hours each day traveling in cars than walking on the streets. Undoubtedly, many find a greater sense of security and privacy in traveling in an automobile than they do in exposing themselves by pedestrian or other modes of travel. Were the individual subject to unfettered governmental intrusion every time he entered an automobile, the security guaranteed by the Fourth Amendment would be seriously circumscribed. As Terry v. Ohio recognized, people are not shorn of all Fourth Amendment protection when they step from their homes onto the public sidewalks. Nor are they shorn of those interests when they step from the sidewalks into their automobiles.

*Delaware v. Prouse*, 440 U.S. 648, 662-63, 99 S.Ct. 1391, 1400-01 (1979).

constitution does not forbid all searches and seizures, but only <u>unreasonable</u> searches and seizures. *Elkins v. United States*, 364 U.S. 206, 222, 80 S.Ct. 1437, 1446 (1960). Nonetheless, as the United States Supreme Court pointedly noted over one hundred years ago:

> No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law.

*Union Pacific Railroad Co. v. Botsford*, 141 U.S. 250, 251, 11 S.Ct. 1000, 1001 (1891).

In many search and seizure scenarios, the question of legal authority (as well as reasonableness) is presumptively satisfied by a judicially-issued warrant. However, over the years, many exceptions to the warrant requirement have been recognized. For instance, and pertinent to the issue in this case, in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868 (1968), the Supreme Court held that a law enforcement officer can stop and briefly detain a person for investigatory purposes, even without a warrant, if the officer has a reasonable suspicion – supported by articulable facts – that criminal activity "may be afoot," even if the officer lacks probable cause for an arrest. *Id*. at 30, 88 S.Ct. at 1884-85. However, the officer conducting such an investigatory stop must be able to articulate something more than an "inchoate and unparticularized suspicion or 'hunch.'" *Id*. at 27, 88 S.Ct. at 1883. Moreover, the mere fact that an officer's suspicion or hunch, in fact, was well-founded is <u>not</u> dispositive for a constitutional analysis, rather, the Fourth Amendment requires "some level of objective justification for making the stop." *INS v. Delgado*, 466 U.S. 210, 217, 104 S.Ct. 1758, 1763 (1984).

8

The concept of "reasonable suspicion" is not "readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232, 103 S.Ct. 2317, 2329 (1983). In large part, common sense dictates the analysis of reasonable suspicion.

> The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behaviors; jurors as fact-finders are permitted to do the same and so are law enforcement officers.

*United States v. Cortez*, 449 U.S. 411, 418, 101 S.Ct. 690, 695 (1981). As such, in evaluating the validity of a *Terry* stop, "the totality of the circumstances – the whole picture" must be considered. *Id*. at 417, 101 S.Ct. at 695.

In the present case, when Det. Nunez approached the Chevy Beretta (then parked in the fire lane in front of the Wal-Mart) and asked Dethrow to turn off the car and give her the keys, a stop occurred triggering Fourth Amendment scrutiny. The Government asserts that the vehicle stop is justified under a reasonable suspicion analysis. Consequently, the initial validity of the stop of the Chevy Beretta turns on an evaluation of the facts known to Det. Nunez prior to the stop and whether those facts provide an appropriate level of <u>objective</u> justification that criminal activity might be afoot.

The facts known to Det. Nunez can be easily summarized:

    (1)    Det. Nunez had been advised from a reliable source that two individuals (a male and a female) in Wal-Mart were initially shopping together and that the individuals had selected for possible purchase packets of pseudoephedrine, hydrogen peroxide, and coffee filters.

    (2)    Det. Nunez observed that the male individual was speaking on a hands-free phone (with an earpiece) while checking out with part of the

> pseudoephedrine and the female individual (while checking out at a different lane with the remainder of the pseudoephedrine) was also speaking on her cell phone.
>
> (3) Det. Nunez observed that the male individual, after completing his purchases, stood in front of the store and paced back and forth even though it was extremely cold outside.
>
> (4) Det. Nunez observed that, while checking out, the female individual was constantly looking around and acting suspiciously.[2]

While these facts may present a somewhat close case, when considered in totality with the officer's experience and specialized training, the Court concludes that Det. Nunez had sufficient and reasonable suspicion to make an investigatory stop under *Terry*. This conclusion is consistent with Eighth Circuit jurisprudence.

For instance, in *United States v. Ameling*, 328 F.3d 443 (8th Cir. 2003), the Eighth Circuit concluded that a law enforcement officer had sufficiently reasonable suspicion to stop a vehicle based on suspected intent to manufacture methamphetamine. In *Ameling*, the officer stopped a suspect's vehicle after learning and/or observing:

> (1) Two suspects had purchased a significant amount of pseudoephedrine, known to the officer to be a methamphetamine precursor.
>
> (2) The two suspects had split the purchase into two separate transactions.

---

[2] When Dethrow and Newland were first spotted in the Wal-Mart by the loss prevention officer, they were observed to be acting "goofy." The record is not clear that this observation was communicated to Det. Nunez.

10

(3) Although the suspects had entered the store together, they split up after selecting their purchases and went to separate registers even though the store was not busy.

(4) The suspects did not leave the store together, but had reunited only after they were back at one of the suspect's vehicles.

(5) The suspects then went to another nearby store and purchased a lithium battery, known to the officer to be a methamphetamine precursor.

*Id*. at 448. While the facts in the present case are slightly different than those before the Court in *Ameling*, the differences are not dispositive. Consequently, this Court, like the *Ameiling* court concludes:

> While each individual action taken by the defendants could be susceptible to innocent explanation, their behavior must be considered as a whole and in the light of the officers' "experience and specialized training." Here, [the officer's] experience and training . . . indicated that the defendants' actions were consistent with those of methamphetamine manufacturers trying to disguise their illegal operations. On this record, we cannot conclude that the officers' suspicion of criminal activity was unreasonable.

*Id*. (*quoting*, *in part*, *United States v. Aryizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 750 (2002)).

Moreover, once the investigatory stop was properly initiated, Det. Nunez (and later Det. Howe) were entitled to conduct an investigation "reasonably related in scope to the circumstances which justified the interference in the first place." *United States v. Cummins,* 920 F.2d 498, 502 (8th Cir.1990) (*quoting Terry v. Ohio, supra*, 392 U.S. at 20, 88 S.Ct. at 1884). To that end, the Court concludes that the officers at the scene of the investigatory stop acted properly in taking the keys to the Chevy Beretta (for officer and bystander safety), in asking the inhabitants of the vehicle to keep their hands in plain sight, in radioing in the vehicle license plate, and (eventually) in removing Newland from the vehicle after she repeatedly refused to

keep her hands in plain sight. In addition, the duration of the stop "lasted no longer than reasonably necessary to investigate [the officers'] suspicion that the defendants had been purchasing methamphetamine precursors for an illegal purpose." *Ameling*, 328 F.3d at 448.

Finally, as part of the investigatory stop, the officers were entitled to "check for weapons and take any additional steps that [were] 'reasonably necessary to protect their personal safety and to maintain the *status quo* during the course of the stop.'" *United States v. Navarrete-Baron*, 192 F.3d 786, 790 (8th Cir. 1999) (*quoting*, *in part*, *United States v. Hensley*, 469 U.S. 221, 235, 105 S.Ct. 675, 682 (1985)). In this case and under the peculiar circumstances of Newland refusing to sit still in the Chevy Beretta, the officers were entitled to remove her from that vehicle and place her in the police cruiser. In the process of placing Newland in the police cruiser, it was reasonable for the officers to conduct a pat-down of Newland. Upon discovery of the receipt for syringes (as well as the baggies containing white powder and white residue), the officers were reasonably concerned about the possibility that either of the remaining occupants of the Chevy Beretta could have possession of or quick access to needles. Consequently, the officers acted appropriately in having the occupants (Dethrow and Nanos) exit the vehicle.

Inasmuch as the officers were reasonable up until the point each of the suspects was asked to exit the vehicle, the fact that all three suspects smelled of a heavy chemical odor familiar to the officers as the smell of methamphetamine manufacturing all falls within the realm of "plain smell"[3] since the officers were in a location that they were legally entitled to be.

---

[3]  *See*, *e.g.*, *United States v. Clayton*, 210 F.3d 841, 845 (8th Cir. 2000) (an officer "developed probable cause for a search based on his immediate perception of an odor associated with methamphetamine production"); *United States v. McCoy,* 200 F.3d 582, 584 (8th Cir.2000) (*per curiam*) (explaining the "plain smell" rule).

12

Unfortunately for the defendants, the plain smell of methamphetamine manufacturing, combined with all of the factors attendant at the scene discussed *supra*, provided the law enforcement officers with probable cause to arrest the three defendants.[4]

> Probable cause to arrest exists if, at the moment that an arrest was made, the facts and circumstances within the arresting police officer's knowledge were sufficient to support a prudent person's belief that the person arrested was committing a crime.

*United States v. Gonzales*, 220 F.3d 922, 925 (8th Cir. 2000). With the valid arrests, the officers thereafter were permitted to make a search of the vehicle incident to arrest (and/or an inventory search of the vehicle).

Accordingly, it is

**RECOMMENDED** that the Court, after making an independent review of the record and applicable law, enter an order **DENYING** the separate motions to suppress filed by Defendant Dethrow, Defendant Newland and Defendant Nanos (Docs. #49, 47, and 51 respectively).

Counsel are reminded that each has 10 days from the date of receipt of a copy of this report and recommendation to file and serve specific objections to the same. A failure to file and serve timely objections shall bar attack on appeal of the factual findings in this report which are accepted or adopted by the district judge except upon the ground of plain error or manifest injustice.

                                                */s/ John T. Maughmer*
                                                **John T. Maughmer**
                                  **Chief United States Magistrate Judge**

---

[4] In addition to the plain smell, Newland attempted to conceal a bottle apparently containing a marijuana cigarette in the back seat of the police cruiser.